# EXHIBIT "D"

# (PLAINTIFFS' NOTICE OF 30(b)(6) DEPOSITION TO ILLINOIS NATIONAL INSURANCE CO.)

1  John D. Shugrue, Esq.
   Kevin B. Dreher, Esq.
2  REED SMITH LLP
   10 South Wacker Drive, Suite 4000
3  Chicago, Illinois 60606-7507
   Tel: (312) 207-1000
4  Fax: (312) 207-6400
   Email: JShugrue@ReedSmith.com;
5  KDreher@ReedSmith.com

6  -and-

7  Andrew F. Dixon, Esq.
   Nevada State Bar No. 8422
8  BOWLER DIXON & TWITCHELL LLP
   3137 East Warm Springs Road, Ste. 100
9  Las Vegas, Nevada 89120
   Phone: (702) 436-4333
10 Fax: (702) 260-8983
   Email: andrew@nevadalegalcounsel.com
11

12 *Attorneys for Plaintiffs INTERNATIONAL GAME
   TECHNOLOGY and IGT-UK GROUP LIMITED*

13

14              **UNITED STATES DISTRICT COURT**

15                    **DISTRICT OF NEVADA**

16 INTERNATIONAL GAME TECHNOLOGY          Civil No. 2:16-cv-02792
   and IGT-UK GROUP LIMITED,
17
            Plaintiffs,
18
                                          **PLAINTIFFS' NOTICE OF 30(b)(6)**
   v.                                     **DEPOSITION TO ILLINOIS**
19                                        **NATIONAL INSURANCE CO.**
   ILLINOIS NATIONAL INSURANCE CO.,
20
            Defendant.
21

22      PLEASE TAKE NOTICE THAT, pursuant to Federal Rules of Civil Procedure 30 and

23 30(b)(6), Plaintiffs International Game Technology and IGT-UK Group Limited, by and

24 through their attorneys Reed Smith LLP, will take the oral deposition of Illinois National

25 Insurance Co. through one or more of its officers, directors, managing agents, or other persons

26 who are most familiar with and will testify on its behalf for discovery purposes in this matter

27

28

                                          1

*left margin:* BOWLER DIXON & TWITCHELL LLP
3137 E. Warm Springs Rd., Suite 100
Las Vegas, Nevada 89120

1  concerning the Topics of Examination set forth in the attached Exhibit A.  The deposition shall

2  commence at 9:00 a.m. on July 13, 2017 before a notary public or other person duly authorized

3  by law to administer oaths, at the offices of Reed Smith LLP, 10 South Wacker Drive, 40th

4
5  Floor, Chicago, IL 60606.  The deposition will be recorded by a court reporter and videographer

6  and will continue until completed.

7          DATED this June 28, 2017.

8

9                                        By: /s/ Andrew F. Dixon
                                              Andrew F. Dixon, Esq.
10                                            Nevada State Bar No. 8422
                                              BOWLER DIXON & TWITCHELL LLP
11                                            3137 East Warm Springs Road, Ste. 100
                                              Las Vegas, Nevada 89120
12                                            Phone: (702) 436-4333
                                              Fax: (702) 260-8983
13                                            Email:  andrew@nevadalegalcounsel.com

14                                            -and-

15                                            John D. Shugrue, Esq.
                                              Kevin B. Dreher, Esq.
16                                            REED SMITH LLP
                                              10 South Wacker Drive, Suite 4000
17                                            Chicago, Illinois 60606-7507
                                              Tel: (312) 207-1000
18                                            Fax: (312) 207-6400
                                              Email:  JShugrue@ReedSmith.com
19                                            KDreher@ReedSmith.com;

20                                            *Attorneys for Plaintiffs INTERNATIONAL
                                              GAME TECHNOLOGY and IGT-UK GROUP
21                                            LIMITED*

22

23

24

25

26

27

28

BOWLER DIXON & TWITCHELL LLP
3137 E. Warm Springs Rd., Suite 100
Las Vegas, Nevada 89120

2

BOWLER DIXON & TWITCHELL LLP
3137 E. Warm Springs Rd., Suite 100
Las Vegas, Nevada 89120

## CERTIFICATE OF SERVICE

I, the undersigned, declare under penalty of perjury, that I am over the age of eighteen (18) years, and I am not a party to, nor interested in, this action. On this date, I caused to be served a true and correct copy of the foregoing: **PLAINTIFFS' NOTICE OF 30(b)(6) DEPOSITION TO ILLINOIS NATIONAL INSURANCE CO.** by the method indicated:

    X          U. S. Mail

    _____    CM/ECF Electronic Filing System

    _____    Facsimile Transmission

and addressed to the following:

Amy M. Samberg
FORAN GLENNON PALANDECH
PONZI & RUDOLFF PC
1 East Washington Street, Suite 500
Phoenix, AZ 85004
Email: asamberg@fgppr.com

-and-

Justin S. Hepworth
Casey G. Perkins
FORAN GLENNON PALANDECH
PONZI & RUDOLFF PC
2200 Paseo Verde Parkway, Suite 280
Henderson, NV 89052
Email: jhepworth@fgppr.com; cperkins@fgppr.com

*Attorneys for Defendant Illinois National
Insurance Co.*

DATED this 28th day of June, 2017.

                            /s/ Celeste A. Guinn
                            An employee of Bowler Dixon & Twitchell
                            LLP

3

# EXHIBIT A

<u>DEFINITIONS</u>

1.    "IGT," for the purposes of this notice only, includes the Plaintiffs herein, and their past and present divisions, parents, subsidiaries, affiliates, directors, officers, employees, agents, shareholders, members, partners, predecessors, successors, assigns, heirs, executors, administrators, trustees, personal representatives, any and all persons acting or that You contend were at any time acting under its direction or control or on its behalf, as that term is defined herein.

2.    "Barcrest," for purposes of this notice only, means the company Barcrest Group Limited, which is a former wholly owned subsidiary of IGT-UK.

3.    "SNAI" means SNAI S.p.A, an Italian gaming operator.

4.    "Global Draw" means Global Draw Limited.

5.    "Scientific Games" refers to Scientific Games Corporation.

6.    "Scientific Games' Claim" refers to SGI's insurance claim (as described in Paragraph 9 of the Affidavit of Robert Becker attached hereto as Exhibit 1) under a "run-off" policy which You sold to SGI for the policy period of September 22, 2011 to September 22, 2014 (described in Paragraph 5 of Exhibit 1).

7.    "Defendant," "You," "Your," or "Illinois National" means the Defendant named in IGT's Complaint, including without limitation its present and former affiliates, divisions, and related companies, and all of its respective past and present officers, directors, employees, agents, representatives, underwriters, managing agents, underwriting agents or agencies, claim handlers, adjusting agents, and attorneys, and any Person or entity who has acted or purported to act on any of its behalf or in concert with it.

8.    "Person" includes both the singular and plural and shall mean any natural person,

- 3 -

business entity, corporation, cooperative, bureau, public corporation, partnership, joint venture, group, club, association, institute, society, office, organization and any governmental entity or department, agency, bureau, or political subdivision thereof.

9.     "Representative" includes both the singular and plural and: (a) any past or present officer, director, partner, associate, employee, servant, agent, subsidiary, affiliate, legal counsel, or any agent of such Persons, and (b) any other Persons acting or purporting to act on behalf of, or in concert with, such Persons, including, without limitation, insurance brokers or agents, actuaries and consultants of any type.

10.     "Illinois National Policy" or "Policy" includes but may not be limited to the "Pro Tech" technology errors and omissions insurance policy issued by Illinois National to IGT that was in effect from June 30, 2011 through June 30, 2012, policy number 02-135-16-96. "Illinois National Policy" or "Policy" also refers to any and all sections and/or modules contained therein, including but not limited to the BASE section and the TECH module.

11.     "Tesi Claim" means the August 9, 2011 demand by Stefano Tesi to SNAI that SNAI pay an erroneous jackpot.

12.     "Cincotti Claim" means the August 29, 2011 demand by Valerio Cincotti to SNAI that SNAI pay an erroneous jackpot.

13.     "April 16, 2012 Incident" refers to the 183 erroneous winning tickets and 242 wins with erroneous jackpots ranging from approximately €490,000 to approximately €9 million, totaling more than €450 million, which were either printed by or displayed on Video Lottery Terminals ("VLTs") through Barcrest's proprietary IT platform system at a number of SNAI locations on April 16, 2012, and which resulted in more than 100 players initiating or threatening claims, and the owners of establishments in which SNAI-operated VLTs were

- 4 -

located asserting or threatening claims.

14.    "MEF Claim" means the April 17, 2012 directive issued by the Italian State Ministero del'Economia e delle Finanze ("MEF") to "proceed immediately to blocking the system" and the Barcrest system was immediately shut down.

15.    "SNAI Suit" means the lawsuit initiated by SNAI on October 5, 2012 against Barcrest and Global Draw in the Tribunal of Rome, entitled *SNAI S.p.A. v. Barcrest Group Limited and Global Draw Limited,* Docket No. 60.782/2012.

16.    "Global Draw Claim" means the November 2, 2012 letter from Global Draw to Plaintiffs asserting that Plaintiffs must indemnify it for all losses incurred in connection with the SNAI Suit.

17.    "Global Draw Suit" means the lawsuit filed by Global Draw on September 17, 2013 against Plaintiffs in the London Commercial Court, entitled *Global Draw Limited v. International Game Technology and IGT-UK Group Limited,* Claim No. 2013 Folio 1246, In the High Court of Justice, Queen's Bench Division, Commercial Court, Royal Courts of Justice.

18.    "Settlement" refers to the settlement agreement entered into by the parties in the Global Draw Suit on May 18, 2015.

19.    "IGT's Claim" means IGT's claim for defense and indemnity under the Illinois National Policy arising out of the Tesi Claim, the Cincotti Claim, the MEF Claim, the SNAI Suit, the Global Draw Claim and/or the Global Draw Suit.

20.    "Communication" means any and all manner or means of disclosure, transfer, or exchange of information, whether orally or by document, whether face-to-face, by telephone, telecopy, fax, mail, e-mail, and personal delivery or otherwise.

21.    "Including" means "including without limitation," "likewise," "and," "or," and

"and/or," unless the context clearly requires otherwise.

22.    The terms "relating to" or "relates" mean, without limitation, embodying, mentioning, pertaining to, referring to, and alluding to, concerning or reflecting, directly or indirectly, the subject matter identified in a specific request.

## TOPICS OF EXAMINATION

1.    The drafting, development, creation, negotiation, underwriting, and issuance of the Illinois National Policy.

2.    All Persons involved in the drafting, development, creation, negotiation, underwriting, and issuance of the Illinois National Policy.

3.    The drafting, development, creation, negotiation, underwriting, and issuance of the Specific Entity Exclusion Endorsement, Endorsement # 35 of the Illinois National Policy.

4.    All Persons involved in the drafting, development, creation, and negotiation of the Specific Entity Exclusion Endorsement, Endorsement # 35 of the Illinois National Policy.

5.    The drafting, development, creation, negotiation, underwriting, and issuance of the "run off" policy that You sold to Scientific Games for the policy period of September 22, 2011 to September 22, 2014, policy number 01-166-70-51.

6.    All Persons involved in the drafting, development, creation, negotiation, underwriting, and issuance of the "run off" policy that You sold to Scientific Games for the policy period of September 22, 2011 to September 22, 2014, policy number 01-166-70-51.

7.    The meaning, interpretation, construction, effect, and application of:

    a.  Exclusion 4(b) of the BASE Section of the Illinois National Policy;

- 6 -

    b.  Exclusion 4(o) of the BASE Section of the Illinois National Policy;

    c.  Exclusion 4(r) of the BASE Section of the Illinois National Policy;

    d.  AMD-1 of the BASE Section of the Illinois National Policy, as amended by Endorsement # 24;

    e.  Clause 7(b)(2) of the Base Section of the Illinois National Policy, as amended by Endorsement # 26;

    f.  Specific Entity Exclusion Endorsement, Endorsement # 35 of the Illinois National Policy.

8.    The date and manner in which You first became aware of the SNAI Suit.

9.    The date and manner in which You first became aware of the Global Draw Claim.

10.    The date and manner in which You first became aware of the Global Draw Suit.

11.    The date on which You first anticipated litigation with IGT with respect to IGT's Claim.

12.    The date(s) and amount(s) of any reserve(s) You set for IGT's Claim, including any adjustments thereto.

13.    The review, processing, handling, investigation, analysis, evaluation, and/or adjustment of IGT's Claim by or on behalf of Illinois National, including but not limited to such work performed on Illinois National's behalf by attorneys at the law firms Winget Spadafora Schwartzberg LLP and Foran Glennon Palandech Ponzi & Rudloff PC, respectively.

14.    All Persons involved in the determination of coverage for IGT's Claim by or on behalf of Illinois National, including but not limited to any of Your employees and agents and any attorneys at the law firms Winget Spadafora Schwartzberg LLP and Foran Glennon

Palandech Ponzi & Rudloff PC, respectively.

15.     All Communications between or among George Pagano, Robert Jones, and Jim McQuaid on and after February 18, 2015 relating to IGT's Claim and SGI's Claim, including but not limited to all Communications regarding the "coverage issues and Steve Hong's request below" identified in George Pagano's February 18, 2015 email.

16.     All Communications with or involving Your underwriting personnel relating to IGT's Claim.

17.     All Communications by or on behalf of Illinois National with IGT and/or any of its brokers relating to IGT's Claim.

18.     All coverage evaluations by or on behalf of Illinois National concerning the Tesi Claim, the Cincotti Claim, the MEF Claim, SNAI Suit, the Global Draw Claim and/or Global Draw Suit and the issues discussed and conclusions reached in each evaluation.

19.     Your Communication to IGT of all coverage evaluations by or on behalf of Illinois National concerning the Tesi Claim, the Cincotti Claim, the MEF Claim, SNAI Suit, the Global Draw Claim and/or Global Draw Suit.

20.     The review, processing, handling, investigation, analysis, evaluation, and/or adjustment of Scientific Games' Claim by or on behalf of Illinois National, including but not limited to such work performed on Illinois National's behalf by any of Your employees and any attorneys at outside law firms representing You in connection with Scientific Games' Claim.

21.     All Persons involved in the determination of coverage for Scientific Games'

Claim by or on behalf of Illinois National and all Communications between such Persons and Persons identified in response to Topic # 14 relating to IGT's Claim and Scientific Games' Claim.

22.    All factual bases for Illinois National's failure to defend IGT and/or Barcrest in connection with the SNAI Suit.

23.    All factual bases for Illinois National's failure to defend and indemnity IGT in connection with the Global Draw Suit.

24.    All factual bases for Your Eleventh Affirmative Defense, including all "terms, conditions, definitions, limitations and exclusions contained in the Illinois National Policy and/or by public policy and/or express provision of law" that You allege bar, in whole or in part, IGT's Complaint.

23.    All factual bases for Your Fifteenth Affirmative Defense, including but not limited to all bases for your contention that the November 10, 2014 ruling by the Court of Pistoia in regards to the Tesi Claim forecloses IGT's Claim in whole or in part by operation of claim preclusion, issue preclusion and/or res judicata.

24.    All factual bases for Your other Affirmative Defenses dated January 11, 2017 (dkt. # 14).

25.    The identity of and factual bases for any other affirmative defenses on which you intend to rely in this case.

- 9 -

26.    Any contention by You that any of the legal fees and/or expenses incurred by IGT in connection with IGT's Claim were unreasonable and the factual bases for this contention.

27.    Any contention by You that any of the legal fees and/or expenses incurred by IGT in connection with IGT's Claim were unnecessary and the factual bases for this contention.

28.    Any contention by You that the Settlement was unreasonable and the factual bases for this contention.

29.    Any contention by You that any provision in the Illinois National Policy applies to bar coverage for IGT's Claim and the factual bases for this contention.

30.    Any contention by You that the Global Draw Suit does not "allege[] any wrongful act which is the same as or related to any wrongful act alleged in": (a) the Global Draw Claim; (b) the SNAI Suit (c); the MEF Claim and/or (d) the Tesi Claim.

31.    Any alleged prejudice You suffered by reason of the timing of notice of the (a) Tesi Claim; (b) Cincotti Claim; (c) April 2012 Incident; (d) MEF Claim; (e) SNAI Suit; (f) Global Draw Claim, and/or (g) Global Draw Suit.

32.    Whether and to what extent any of the following are "related" to each other, as the term is used in clause 7(b)(2)(b) of the Illinois National Policy: the Tesi Claim, the Cincotti Claim, the MEF Clami, the SNAI Suit, the Global Draw Claim, and the Global Draw Suit.

33.    The circumstances regarding the termination or conclusion of Daniel Godsill's employment by AIG, including without limitation the disposition of any paper files and electronically stored information of or pertaining to Daniel Godsill's work in regards to IGT's

Claim.

# EXHIBIT 1

FILED: NEW YORK COUNTY CLERK 07/24/2015 05:27 PM    INDEX NO. 650824/2015
NYSCEF DOC. NO. 65    RECEIVED NYSCEF: 07/24/2015

IN THE SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK COUNTY

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, <br>              Plaintiff, <br><br> v. <br><br> SCIENTIFIC GAMES CORPORATION, BARCREST GROUP LTD., and GLOBAL DRAW LTD., <br><br>            Defendants and Third-Party Plaintiffs, <br><br> v. <br><br> CERTAIN UNDERWRITERS AT LLOYD'S, SYNDICATES Nos. 510 and 2987, Subscribing to Policy No. B0713MEDTE1100196; <br><br> CERTAIN UNDERWRITERS AT LLOYD'S, SYNDICATE No. 4711, Subscribing to Policy No. B0713MEDTE1100722; and <br><br> LIBERTY MUTUAL SURPLUS INSURANCE CORPORATION, Subscribing to Policy No. EO5N765198004, <br><br>           Third-Party Defendants. | Index No. 650824/2015 <br><br> Hon. Saliann Scarpulla <br> IAS-Part 39 |

## AFFIDAVIT OF ROBERT BECKER

Before me, the undersigned authority personally appeared Mr. Robert Becker, who after

first being duly sworn, testified as follows:

1.

My name is Robert Becker. From October 1996 to March 2001, I was Treasurer of

Scientific Games Corporation ("SGC") and from April 2001 to March 2015, I was Vice

President and Treasurer of SGC. During such periods, the procurement of insurance was

included as one of my principal areas of responsibility. I attended Gettysburg College and

graduated with a B.A. degree in Business Administration in June 1981, and attended LaSalle University and graduated with an M.B.A degree in Finance in May 1987. For over 18 years, I worked closely with SGC's management and its insurance brokers to assess the business risks faced by SGC and its subsidiaries and to purchase various types of insurance policies to cover those risks. In addition, when SGC incurs financial losses or faces liability claims asserted by third parties, I work with SGC management, the insurance brokers, and SGC representatives to address those losses and claims and, when appropriate, to assert claims for insurance coverage to SGC's insurers to cover SGC's losses. I have personal knowledge, to the best of my recollection, of the facts and information set forth below:

## 2.

From October 2008 through October 2014, SGC maintained primary errors and omissions ("E&O") insurance with Beazley Furlong ("Beazley"), a Lloyd's of London syndicate that has significant experience insuring liability risks of technology-based companies like SGC. During this period, I had a close, professional working relationship with officials at Beazley, and I (as well as my SGC colleagues) considered Beazley to be a valued business partner of SGC. In placing insurance policies with Beazley, I have worked closely with insurance brokers from the Lockton Companies, primarily with Ms. Emily Freeman, since February 2008. From October 2008 through October 31, 2013, when SGC purchased its last E&O liability policy from Beazley, SGC paid Beazley in excess of $4.9 million in insurance policy premiums.

## 3.

In the six years that SGC purchased primary E&O insurance from Beazley, SGC made a number of claims for insurance coverage to Beazley to cover losses sustained by SGC as a result of third-party claims against SGC. In all of those prior claims, I worked closely with two

Beazley representatives—Ms. Beth Diamond, Beazley's head of North American claims, and Ms. Joan D'Ambrosio, a partner in the law firm of Clyde & Co. LLP, who served as Beazley's primary insurance coverage lawyer for many years. I developed a cordial and professional working relationship with Ms. Diamond and Ms. D'Ambrosio during this lengthy period of time.

4.

In April 2011, Global Draw Limited ("GDL"), a subsidiary of SGC and an insured entity under the E&O insurance program with Beazley, and SGC signed a contract to purchase a company called Barcrest Group Limited ("Barcrest"), a United Kingdom—based manufacturer of video lottery terminals and other electronic gaming equipment. I was personally involved in the process pursuant to which Barcrest's business operations would be transitioned into SGC's global insurance programs. SGC's acquisition of Barcrest closed on September 22, 2011. As of that date, SGC and GDL were insured under a primary E&O liability policy issued by Beazley, with a policy period of October 31, 2010 – October 31, 2011 (the "Beazley 2010 E&O Policy"). Effective on the acquisition date, Barcrest was added as a covered insured under the Beazley 2010 E&O policy. SGC renewed its primary E&O insurance coverage with Beazley, effective October 31, 2011 (the "Beazley 2011 E&O Policy"). Like its earlier policies sold to SGC, the Beazley 2011 E&O Policy was a "claims made" policy that covered claims made against Barcrest (and other SGC businesses) during the Beazley policy period, subject to the terms and conditions of the Beazley policy. The Beazley 2011 E&O Policy expressly insures "Barcrest Corp," for "Prior Acts" coverage, with a Retroactive Date of September 23, 2011, meaning that claims asserted against Barcrest after the October 31, 2011 inception date of the Beazley 2011 E&O Policy were covered so long as the claims arose from some wrongful acts or omissions that took place on or after September 23, 2011.

5.

Prior to its acquisition by SGC, Barcrest was an insured under an E&O policy purchased by Barcrest's parent company, International Game Technology ("IGT"), from Illinois National, an AIG-affiliated insurer (the "AIG E&O Policy"). In connection with the Barcrest acquisition, SGC purchased a "run-off" of the AIG E&O Policy insurance policy (the "AIG Run-off Policy"), that provided coverage for certain Barcrest claims and losses in accordance with the terms and conditions of the AIG E&O Policy. The AIG Run-off Policy had an effective period of September 22, 2011 – September 22, 2014. In general terms, the AIG Run-off Policy covered Barcrest's losses for claims made after September 22, 2011 arising from any wrongful acts or omissions that occurred prior to the closing of the Barcrest acquisition on September 22, 2011.

6.

Attached to this Affidavit as **Exhibit A** is a copy of the Beazley 2011 E&O Policy. Attached to this Affidavit as **Exhibit B** is a copy of the AIG Run-off Policy, together with the cover email from SGC's broker showing that SGC received a copy of the AIG Run-off Policy on April 25, 2012. The policy periods of the AIG Run-off Policy and the Beazley 2011 E&O Policy were concurrently in force for the entire Beazley policy period. SGC received the AIG Run-off Policy approximately four months after it received the Beazley 2011 E&O Policy, and after notice of the April 2012 Events was given to Beazley.

7.

On the evening of April 16, 2012, I was advised by other SGC employees that there was a serious malfunction involving many Barcrest-supplied video lottery terminals ("VLTs") in a number of locations in Italy. The VLTs in question were supplied by Barcrest to an Italian

company known as SNAI, S.p.A. ("SNAI"). I was advised on April 16, 2012 that SNAI reported earlier that day that numerous apparent winning jackpot tickets were issued from a large number of Barcrest-supplied VLTs in an aggregate amount of several hundred million euros at various gaming parlors and similar establishments in Italy (the "April 2012 Events"). Because under normal operations there would not be so many winning tickets issued in such a short period of time, SNAI and Barcrest shut down the system throughout Italy and began an investigation into the causes of the April 2012 Events. Within a day or two of the April 2012 Events, SNAI expressed its intent to hold Barcrest responsible for the losses caused by those Events. I was further advised that the causes of the April 2012 Events were complex and technical, and that an investigation was underway to attempt to determine the causes.

8.

The following day, April 17, 2012, Ms. Diane Kincaid, SGC's Director, Insurance and Risk Management, who works for me, and I contacted SGC's insurance broker, Ms. Emily Freeman at Lockton, to advise her of the April 2012 Events and to ask her to notify SGC's primary E&O insurer, Beazley, of the April 2012 Events and that SGC would be seeking insurance coverage from Beazley for losses arising from those Events. Ms. Freeman promptly notified Beazley of the April 2012 Events and sent me an email dated April 18, 2012 (copy attached as **Exhibit C**) to advise me that Ms. Diamond of Beazley had acknowledged Beazley's receipt of SGC's notice of the April 2012 Events.

9.

In the first weeks after April 16, 2012, it was reported to me that based on SGC's preliminary investigation, it appeared that a contributing factor in the issuance of the erroneous jackpot tickets was a "bug" in the software of the BetServer that ran the VLT system delivered

by Barcrest and used by SNAI in Italy. I was also advised that, although no one at SGC knew of the existence of the BetServer "bug" until the April 2012 Events occurred, it appeared that the "bug" was present in the Barcrest system that was approved for use in the Italian market in 2009 by the Italian governmental agency that regulated electronic gaming in Italy, and therefore was in existence at the time SGC's acquisition of Barcrest closed in September 2011. In light of this preliminary determination, SGC sent notice to AIG of a potential claim under the AIG Run-off Policy for losses arising from the April 2012 Events (see **Exhibit D**). This notice was sent approximately one week after Lockton, on behalf of SGC, sent notice of the April 2012 Events to Beazley.

### 10.

Within several days of sending notice to AIG, I spoke with Ms. Diamond and Beazley's insurance coverage lawyer, Ms. D'Ambrosio, and told them that SGC had sent notice of the April 2012 Events to AIG. During this and other telephone conferences in April 2012, I advised Beazley representatives of our preliminary findings. Beazley suggested that, because the software "bug" appeared to have been in place before the September 22, 2011 Retroactive Date in the Beazley 2011 E&O Policy, SGC should focus its insurance coverage efforts on the AIG Run-off Policy for the time being. The Beazley representatives also offered to assist SGC in pursuing coverage from AIG for the April 2012 Events. The Beazley representatives also told me that, in the event SGC determined that wrongful acts during the Beazley 2011 E&O Policy period (October 31, 2011 – October 31, 2012) were causes of the April 2012 Events, then SGC should so advise Beazley and the parties would then resume adjusting SGC's claims for coverage for the April 2012 Events under the Beazley 2011 E&O Policy. At no time during any of these communications did Ms. Diamond, Ms. D'Ambrosio, or any other Beazley representative

suggest in any way that by sending notice of the April 2012 Events to AIG, Beazley would deny

coverage under an exclusion in the Beazley 2011 E&O Policy dealing with notice given to an

insurer whose policy was in effect before the Beazley 2011 E&O Policy. On the contrary, the

Beazley representatives told me that they agreed with SGC sending notice to AIG, and they

encouraged SGC to pursue coverage from AIG for losses arising from the April 2012 Events.

11.

Shortly after SGC sent AIG notice of the April 2012 Events, AIG sent a letter to SGC

denying coverage for losses arising from the April 2012 Events because, among other reasons,

AIG believed that the alleged wrongful acts giving rise to the April 2012 Events occurred during

the Beazley 2011 E&O Policy period. (*See* **Exhibit E** hereto.)

12.

Later in 2012, I learned that several investigations into the causes of the April 2012

Events concluded that certain alleged wrongful acts and omissions in March and April 2012 ——

during the Beazley 2011 E&O Policy period —— were causes of the April 2012 Events.

Specifically, I learned that improper maintenance of communication apparatus for the Barcrest

VLT system in early 2012 caused a key "mirroring" function of the VLT system to become

disengaged, and that during late March and early April 2012, the VLT system was not being

properly monitored in accordance with standard procedures. These determinations were

consistent with the findings of an investigation by the Italian government agency that regulates

the electronic gaming industry in Italy, known as AAMS, which in its February 2013 report,

stated that:

    (a)    improper maintenance and improper monitoring in March and April 2012 —
            during the Beazley 2011 E&O Policy period — caused the April 2012 Events; and

(b)    the "bug" in the BetServer code of the Barcrest VLT system was not a cause the April 2012 Events,

### 13.

Upon learning of the findings that acts and omissions in March and April 2012 were causes of the April 2012 Events (but prior to the February 2013 release of the AAMS report) and pursuant to SGC's prior agreement with Beazley, I contacted Ms. Diamond at Beazley to advise her that SGC would continue its pursuit of insurance coverage from Beazley. In accordance with our prior agreement, Ms. Diamond agreed to resume Beazley's adjustment of SGC's claims for coverage for the April 2012 Events. At no time in 2012, 2013, or 2014 did Ms. Diamond or any other Beazley official advise me or any SGC representative that there was no coverage under the Beazley 2011 E&O Policy because SGC had given notice of the April 2012 Events to AIG.

### 14.

During the period of approximately late 2012 – through June 2013, I participated in numerous meetings and telephone conferences with Ms. Diamond and Ms. D'Ambrosio to discuss coverage under the Beazley 2011 E&O Policy for the April 2012 Events. At no time during any of these meetings or communications did any Beazley representative advise SGC that there was no coverage under the Beazley 2011 E&O Policy because SGC had given notice of the April 2012 Events to AIG.

### 15.

By letter dated July 8, 2013 (copy attached as Exhibit F), Beazley advised SGC that it would defend SGC in the civil lawsuit filed in Italy by SNAI against Barcrest, and that Beazley's defense was pursuant to a reservation of rights. The July 8, 2013 Beazley letter was signed by Ms. D'Ambrosio, Beazley's long-time outside coverage counsel with whom I had dealt for many

years. The letter is 12 pages long, and states that Beazley reserves its rights to deny coverage based on a number of different, specifically-identified exclusions and conditions in the Beazley 2011 E&O Policy. The Beazley July 2013 reservation of rights letter does not make any reference to the "prior notice" exclusion, Exclusion B.2, in the Beazley 2011 E&O Policy dealing with coverage for matters for which a notice of circumstance had been sent to another insurer. Beazley never raised the possibility that coverage was barred under the prior notice exclusion until February 2015. By that time, SGC (with Beazley's encouragement) had convinced AIG to acknowledge the potential for coverage under the AIG Run-off Policy, and to agree to pay a portion of the SGC Defendants' attorneys' fees and other costs to defend against the claims asserted against the SGC Defendants by SNAI.

### 16.

Based upon my long professional working relationship with Beazley, I believed that if Beazley decided to deny any coverage for the April 2012 Events, its denial would be based upon one or more of the exclusions and conditions identified in the July 8, 2013 reservation of rights letter. Specifically, I had no reason to believe, based upon all my communications with Beazley over the years, that Beazley would deny coverage by relying upon a notice-based exclusion in the Beazley 2011 E&O Policy that was never before raised, verbally or in writing, by Beazley.

### 17.

If Beazley had referenced Exclusion B.2—the prior notice exclusion—in its counsel's July 8, 2013 reservation of rights letter, I would have promptly raised this issue with Beazley because I do not read Exclusion B.2 as having anything to do with this matter and, further, because Beazley actively encouraged SGC to pursue coverage from AIG and had even offered its assistance to SGC to pursue coverage from AIG. If, regardless of my protests, Beazley had

maintained the prospect of denying coverage because SGC had given notice of the April 2012 Events to AIG, I would have considered recommending to SGC management that SGC withdraw its notice of the April 2012 Events sent to AIG and focus SGC's insurance coverage efforts exclusively on Beazley and the excess insurers above Beazley. I would have made this recommendation for the following reasons:

-- in July 2013 AIG was standing firm on its denial of coverage for SGC's losses arising from the April 2012 Events, on the grounds that there was no claim or wrongful act that occurred during the AIG Run-off Policy period, and

-- the AIG Run-off Policy had a limit of $10 million, whereas the Beazley 2011 E&O Policy had a limit of $20 million, above which there were three excess insurance policies, each with a $10 million coverage limit, for a total of $50 million in potential coverage.

In other words, if Beazley had taken the position there was no coverage because SGC had sent notice of the April 2012 Events to AIG, in effect forcing SGC to seek coverage under either the AIG Run-off Policy or the Beazley 2011 E&O Policy, I would have recommended that SGC pursue coverage under the insurance program with the largest limits available (Beazley) and where the primary insurer had already acknowledged its duty to defend SGC under their policy (also Beazley).

18.

After SGC received Beazley's July 8, 2013 letter, I participated in several meetings and conference calls with Ms. Diamond and Ms. D'Ambrosio to discuss aspects of coverage for SNAI's Italian lawsuit. At no time in 2013 or 2014 did Beazley ever suggest that it would seek to deny coverage based upon the prior notice exclusion.

19.

In addition, the SGC Defendants renewed their insurance coverage with Beazley in October 2012 and October 2013, purchasing policies that were in effect until October 31, 2013 and October 31, 2014, respectively. Had Beazley advised the SGC Defendants, at any time during 2012, 2013, or 2014, before AIG agreed to pay defense costs and before the renewal of the Beazley E&O policies, that it planned to rely upon the "prior notice" exclusion to deny coverage, in addition to likely withdrawing notice of the April 2012 Events to AIG, SGC would likely not have renewed its E&O insurance coverage with Beazley.

Robert Becker

Sworn to before me this the
23rd day of July, 2015

Notary Public, Lance B Meldon
My commission expires

09-13-2015

